(No. 13808.—Decree affirmed.)

WALTER GILBEY, Defendant in Error, *vs.* G. W. HAMLIN, Plaintiff in Error.

*Opinion filed April 21, 1921.*

1. SPECIFIC PERFORMANCE—*when contract for conveyance may be canceled for fraud.* A contract for the conveyance of land may be canceled for fraud and misrepresentation where the false statement is of a material fact, is made with knowledge of its falsity and with intention that it shall be relied on, and is, in fact, relied on by the party who is to take the property.

2. FRAUD—*a vendee in a contract for conveyance cannot be charged with negligence in relying on vendor's fraud.* Where two persons are dealing at arm's length the law does not require that neither shall believe the statements of the other, and a vendee in a contract for a conveyance cannot be charged with negligence in relying upon fraudulent statements of the vendor as to material facts which the vendor knows to be false and which he intends shall be relied on.

WRIT OF ERROR to the Circuit Court of Ogle county; the Hon. MAZZINI SLUSSER, Judge, presiding.

GARDNER & GARDNER, SEYSTER & FEARER, and WIRICK & WIRICK, for plaintiff in error.

Roy F. HALL, and McHENRY & DUSHER, for defend-
ant in error.

Mr. JUSTICE DUNN delivered the opinion of the court:

The defendant in error, Walter Gilbey, filed a bill in the
circuit court of Ogle county against G. W. Hamlin for the
cancellation of a contract for the sale by Hamlin to Gil-
bey of 196 acres of land in McHenry county and the sur-
render of a note for $2500 given by Gilbey to Hamlin on
account of the contract. The bill was answered and the
defendant filed a cross-bill praying for the specific perform-
ance of the contract. The cause was heard in open court
and a decree was entered granting the relief prayed in the
original bill and dismissing the cross-bill for want of equity,
whereupon Hamlin sued out this writ of error.

The cause alleged in the bill for the cancellation of the
contract was that it was procured by fraud and misrepre-
sentation, and the court found as the basis of its decree
that the defendant, in order to induce the complainant to
purchase the land, falsely represented that it could be tiled
to advantage and that the owner of the adjoining farm
had promised to join with the owner of the land in ques-
tion to tile it; that the creek at the side of the land in
question had overflowed but once since the defendant had
owned the land, and that was one spring when there were
heavy rains and a great deal of ice in the creek, and that
with this exception no water stood on the land except such
as rained on it; and that the reason the pasture was short
was that sixty-five head of cattle and five horses were pas-
turing there. The court further found that all of these
representations were untrue, as the defendant knew; that
the land could not be tiled to advantage; that the owner
of the adjoining farm had not promised to join in tiling
the land; that the land could not be tiled; that the creek
overflowed each year; that water stood on the land other

than such as rained on it; that the reason the pasture was short was because the land was not good, and there were not sixty-five head of cattle and five horses on the pasture.

The controversy is altogether one of fact. The representations were material. If they were false, were knowingly made by the defendant and were relied on by the complainant, they justified the decree for the cancellation of the contract.

In June, 1919, Gilbey, who was a farmer about fifty-six years old, was living on a farm near Rochelle, in Ogle county, which he had rented for twenty-seven years from the owner, Delos Baxter, a lawyer of Rochelle. He had known Hamlin, who was two or three years older and had been in business in Rochelle forty-five years, twenty-five or thirty years, during which he had had dealings with Hamlin, buying groceries and dry-goods. Hamlin was a friend of Gilbey's landlord, with whom he had visited the farm which Gilbey rented several times. In the afternoon of June 27, 1919, Hamlin came to Gilbey's house alone, proposed to sell him Hamlin's farm and induced Gilbey and his wife to go with him and look at the farm, which was near Marengo, about thirty-two miles from Gilbey's residence. They went in Hamlin's automobile, arriving at the farm, Hamlin says, about three o'clock, and Gilbey about five. Hamlin's farm contained about 168 acres, and was about eighty rods wide east and west and a mile long north and south. A steam railway and an electric railway crossed the farm side by side, cutting off the south 42 acres. There was a highway sixty rods east of the main body of the farm, and a strip of land twelve rods wide connected the main body of the farm of which it was a part, with the highway. This tract was immediately north of the railroad and contained the farm buildings. Just north of it, between the rest of the farm and the highway, was a tract of 28 acres which Hamlin did not own but which by his contract he agreed to convey to Gilbey, subject to the right

of either to cancel the contract if Gilbey failed to get title to the 28 acres. A creek flowed along the north line of the farm and through the northwest corner, and there was a highway along the south line. When Hamlin, with Gilbey and his wife, arrived at the farm they stopped on this road about the middle of the farm and went through a gate there a short distance into the 42 acres south of the railroad, on which corn was growing. They returned to the automobile and went around by the road to the house. Mrs. Gilbey went into the house to examine it while Gilbey looked at the barn and other buildings and went with Hamlin along a lane about thirty rods northwest to the pasture and through the pasture to the creek on the north. Mr. and Mrs. Gilbey returned home, and two days later Hamlin took their three sons, who were nineteen, twenty-two and thirty-one years old, respectively, and had always lived at home and worked on the farm, to look at the land. They did not go on the tract south of the railroad but looked at the buildings and went down through the pasture to the creek, as their father had done. On July 1 Hamlin, with his attorney, went to Gilbey's home and the contract for the sale of the farm was prepared and executed by Gilbey and Hamlin, the purchase price agreed on being $36,000.

A great deal of attention was given on the trial and in the argument here to the representations which were made by Hamlin to Gilbey and his sons as to the nature of the soil, the extent to which the land was infested with morning glories and Canada thistles, the productiveness of the farm, its value, its rental value and the rents paid for land in the neighborhood. The top soil is light sand with no clay mixtures and no clay subsoil but with gravel beneath it. Evidence was introduced on the part of the complainant that the land was only worth from $60 to $100 an acre, while the evidence for the defendant was that it was worth $200 an acre. These facts, however, were not made the basis of the decree, which was founded upon the finding

of the court in regard to the supposed misrepresentations which have been mentioned, in regard to the practicability of tiling the land, the willingness of the adjoining owner to join in the tiling, the overflowing of the land by the creek, and the overpasturing of the land as the cause of the apparent shortness of the pasture. As to these representations the evidence consisted of the testimony of Gilbey and two of his sons, and of Hamlin. Gilbey and his sons all testified to the making of the representations at the times they respectively visited the farm. Gilbey told Hamlin the boys had worked at home and never had any wages and had just as much interest in the farm as Gilbey had. The next day they reported to their father what had occurred on their visit to the farm. The best soil was in the north end of the pasture, near the creek. It needed tiling, and Hamlin pointed out where the tile would have to go through the land of Wright, who, Hamlin said, was anxious to tile and would like to go in with Gilbey and tile. After the contract was made Gilbey went with Hamlin to see Wright about the tiling, and Wright said he did not want it tiled; that he would give Gilbey the privilege of going through his land but he did not think it could be tiled. Hamlin's representation that the creek had only overflowed once since he had owned the land, and that was one spring when there had been heavy rains and a great deal of ice was in the creek, was also testified to by the same witnesses, and evidence was introduced tending to show that the creek frequently overflowed two or three times in the spring; that the water would cover 30 or 40 acres and would sometimes stand a week or ten days, sometimes longer. So in regard to the stock the evidence in regard to the representation was the same, and the testimony of Hamlin's tenant was that there had been no more than fifty head of stock on the farm during the whole season. Hamlin denied that he had made any misrepresentation and gave a different version from the complainant and

his sons of their several conversations, but we cannot say that his testimony outweighs that of the other three. The chancellor, who saw and heard the witnesses, found that the preponderance of the evidence was with the complainant, and we do not disagree with that .conclusion. The decree cannot be reversed because it is not sustained by the evidence.

The plaintiff in error argues that the representations, if proved, were of matters of fact equally open to inquiry by either party, and that in such case the purchaser was bound to make use of his own means of knowledge and use reasonable means to avoid deception, and failing to do so he cannot obtain relief. This is not the law. Where two persons are dealing at arm's length the law does not require that neither shall believe the statements of the other. The rule is that no person who by his fraudulent act has induced another to act to his prejudice can impute negligence to the latter merely because of his reliance upon the former's fraud. (*Leonard* v. *Springer*, 197 Ill. 532.) Where one party to a transaction makes a positive statement of a material fact as true which he knows to be false but intends to be relied upon by the other party as true, and the statement actually is relied and acted upon as true by the other party, the party making the statement cannot charge the other with negligence in believing the false statement or take any benefit from it. (*Linington* v. *Strong*, 107 Ill. 295; *Woodruff* v. *Day*, 278 id. 199.) If the statements of the plaintiff in error in regard to the creek's overflowing were false he knew it, and the defendant in error did not and is not chargeable with negligence for relying upon them.

The decree will be affirmed.     *Decree affirmed.*